Mr. Petrie, you can go first. And there are four of you all arguing. I understand you've divvied up your time. Yes. Okay. If it pleases the court, I'm going to be addressing two issues this morning in my eight minutes. The first is the choice of law issue. The second is the standing issue. Mr. Price and Mr. Mahfoud will follow me and address the regional equivalent value on the contract issues. I'd like to start out very briefly by just addressing the choice of law issue and pointing out three basic errors that occurred below that warrant reversal on that basis alone. The first is that the court below inverted the proper analysis. The correct approach would be determine what the governing law is. And then second, decide whether the entities should be collapsed in some fashion. And here, the court below did exactly the opposite. It started out by saying, I'm going to collapse all the entities, either under a piercing or a substantive consolidation basis, and then I'm going to decide what the choice of law is. The second error that took place is that while the court acknowledged the need to do an individualized analysis of the choice of law, saying, and I quote, each transferee is entitled to a separate choice of law analysis with a recognition of the transferee's particular contacts with respect to each individual fraudulent transfer action. While acknowledging that was what he needed to do, the court below never did that. It simply didn't happen. And the third error is somewhat related to the second, and that is, as this court has directed, the district court is to evaluate the choice of law question on an issue-by-issue basis. And once again, you'll find no analysis in that regard in the opinion below. Turning then to the meatier issue, the question of standing. As the state statute makes clear and as this court has addressed, the Tufta Statute, the Texas Uniform Fraudulent Transfer Act, is available to creditors to pursue. And in this particular case, the law is that the federal equity receivers represent the entities in receivership and not the creditors. So what we have here is a structure where this plaintiff doesn't have the ability, under the state law that governs, it's the only claim that's at issue today under this Tufta claim, to pursue the claim against these particular parties. There is an interesting sort of factual wrinkle that takes place here, and it stems from Judge Gabbi's ruling below, where he said, as I indicated earlier, it doesn't matter whether I look at it as a piercing analysis or as substantive consolidation, I'm going to treat all of these entities as one for the purpose of a remedy. If all of the entities are one, then the receiver's theory about how now all of a sudden he represents only the entities and they're the creditors and the debtors are, quote, the Ponzi scheme and Mr. Stanford and the other two individuals, they've all been collapsed. So if you have one entity left, that entity cannot be both a creditor and a debtor. It's just not a possibility. And so we have then right at the outset, because standing is jurisdictional, a jurisdictional issue that is now embedded in the case where this plaintiff doesn't have the standing to pursue these parties who are the purchasers, the depositors under the CD arrangement. Who would have standing? In this particular case, it would be the other holders of certificates of deposit. It would be any other arm's length creditor. Class action brought by people who suffered losses? By people who suffered losses, that would be one option, yes. It could be if there were a bunch of vendors that were left short at the end of the day, that they could bring either individual actions or class actions. Those are the creditors. Who would be the beneficiaries of the recovery? I'm sorry, the beneficiaries? Who would be the beneficiaries of the recovery of the profits earned by these investors? The same group. I understand. With the receiver, but where does that money go? Well, once the receiver brings money in, the receiver then distributes the money to the various claimants, the largest bulk. And who are those claimants? The bulk of which are the people who, on their certificates of deposit, lost money. Functionally, you end up the same way, don't you? Suppose it should have been brought as a class action on behalf of all persons who invested and lost monies, against all persons who had a net gain. I'm trying to imagine that. What mechanism is there for resolving this issue? It sounds suspiciously like if there's no standing here, then the people who invested and ended up making money out of it do not have to give up those profits, period. There's no one out there who can claim them. Well, of course, we're now many years down the path in terms of addressing what's going on here. But if we were to get into a time machine and go back in time, as Your Honor has pointed out, one of the options for recovery is for the people who lost money in a transaction to bring a class action and pursue it in that way. And the fact that that did not happen doesn't create constitutional jurisprudential standing in the receiver. I'm just trying to understand functionally who are the real claimants here. We've identified the two groups of real claimants, Your Honor. You stop at the receiver level, but the money is where the money flows to. And I understand your answer. The money, if recovery is allowed, would flow to the people who suffered losses. Through the receiver, correct. Through the receiver? Yes, sir. Yeah. Okay. Thank you. All right. Mr. Priest. May it please the court. I'm Philip Price, and I represent a group of Louisiana investors and some Texas investors. And I represent 66 people here, and most of these people are smaller investors. Substantially all of them are Exxon retirees that invested in the CDs and then expected to have the interest income to live on the retirement. And obviously they're here today because part of what they thought that they were going to live on in retirement is being that the government or the receivers are asking that they repay it. I think we all know what the threshold issue is. The threshold issue is whether the contract is enforceable. This issue was looked at in 2009. I represented a number of these individuals then, and at the time it was brought as an equitable proceeding. And essentially the argument was is that everybody should put their money back. And Judge Garwood, who was sitting in Judge Hickenbotham's place, essentially addressed the issue that we're going to talk about today. And he said, he says, where do you draw the line on which contracts are enforceable in a Ponzi scheme and which ones are not? And I think if you look at the case law that we're talking about here in the Carrizola line of cases, you'll see that the courts have dealt with that issue over and over again, that if you knock down one contract, then what other ones do you knock down? And are all contracts invalid just because they're with a Ponzi scheme? Now, I think that what needs to be focused on in this case is that there's a body of law that deals with creditors. It's a very well-developed body of law that we have cited extensively in our brief. And the first thing is is that the payment of interest is an antecedent debt. Now, what does that mean? It means under Texas law that if you pay an antecedent debt, then it's reasonably equivalent value. Now, that law has been in Texas since 1956. It's been that way in every jurisdiction, that the payment of interest is a debt. It's an antecedent debt. So the building blocks of your argument are our decision in 2009 in this case established a legitimate ownership interest. And then you're saying couple that with Texas law and the interest is part of the contract, no different than the principle. That's correct. Okay. But then, of course, I'm sure you're going to get to it, but your time is short. Warfield. Our court announces Warfield. And one could interpret that case to say that in the context of a Ponzi scheme, that is a, quote, unacceptable argument. It's a cheeky argument. It's perpetuating the fraud, and there's nothing of value when you perpetuate a fraud. And there is the Warfield line of cases that say that certain contracts may not be enforceable. Now, Warfield happens to deal with an insider. And if you extrapolate the ruling when you go to non-insiders, does that mean every person that has an employment contract that turns out with a— But Warfield actually would have more sympathetic facts than yours because here the investments were precisely what perpetuated the fraud. In Warfield, let me finish the thought, it's more like an energy or utility company because services were rendered. No one denied that. Well, there's not an investment here. In 2009, this court determined that it was a debt. And that was the reason why, because if you listen to the receiver's argument, he wants to say it's an investment and it's profits. But it's not because in 2009—and then the Carrizola line of cases that we've talked about says the fact that it's a debt instrument is treated differently. For example, if you have a bank that makes a loan to a Ponzi scheme, you have the same issue. Is the interest subject to clawback? Well, the answer to that is no. It's never subject to clawback. There's no case in the United States that exists where interest from a bank is subject to clawback. Because if it was, every time a bank makes a loan, the other creditor is going to say it's a Ponzi scheme and you don't get the interest over the life of the loan. Do you have a case where a Ponzi scheme loan, that was not—as to the interest, it wasn't voidable? Excuse me, say that again. If we're talking about avoidability and whether the interest payments, not profits, but interest payment as to a preexisting contract, which is what you claim we have here. Right. What's the case in the context of a Ponzi scheme where a clawback was disallowed? Where a clawback was disallowed, Carrizola. There's three cases that deal with that issue. One of them is Carrizola, which is kind of the lead authority that they all refer to. Then there's another one out of the Seventh Circuit called Freeland versus Indus. And Carrizola, remind me, was that market rate interest rates? Or was it—how does— Well, in that particular case, in unified credit, it was 12% interest. And in Carrizola, it was 15% interest. And here your clients have all varied amounts? Well, they have varied amounts, but I knew that question would come up today. It's probably between 8% and 9%. It varies, and one of the issues I think which is obvious is whether there's excess interest. Now, that's not the interest that's before the court, but obviously an argument can be made that excess interest above market rate would be subject to the clawback. We think that that's not this proceeding, and if the court were to go forward with it, then it would be a further inquiry. But I think a couple of concepts in terms of creditor, because if this falls into a creditor relationship, and I think that it does. I mean, I think that's what—the reason in 2009 that the court instructed the receiver, go back and file your lawsuit under Tufta. And by the way, we don't contest Texas jurisdiction. We agree that the—I mean, Texas law. We believe that that law is right. But he instructed the receiver to go back and file it under Texas law. There's nothing in Tufta that says that reasonably equivalent value doesn't apply in the context of a fraudulent transaction, insolvent transaction, or a Ponzi scheme. And what they're asking this court to do is rewrite the Texas statute to engraft a Ponzi scheme exception into the law. The other thing is, is that the law is very well developed in every circuit that you're in— Well, your argument, wouldn't we have to conclude that the net worth has remained the same? Because— Because your clients would be in line for the interest amounts. Right, and that's the antecedent debt that's been extinguished. Yeah. The interest accrues daily as a debt. Dividends don't. But interest accrues daily as a debt. So assuming you're accruing interest at $1,000 a day, that is the debt on the book. That's what the law says. Then you make a cash payment to eliminate that debt. The net worth stays the same. And that's the difference between a dividend and an interest payment. And the law is universal that that interest payment accrues daily. Could you save some time for rebuttal, Mr. Mahfoud? Pardon? I do not have a problem. No, but Mr. Price does. You have four minutes and zero minutes. Correct. He has eight minutes and two minutes. May it please the court. I'm George Mahfoud. I represent Enrique and Mary Ann Paredes, who purchased certificates of deposit. The issue I want to address is the question of whether the trial court's determination of Texas public policy was correct. Here, the court made a determination that Texas public policy required it to determine that these CD contracts were against public policy and void and unenforceable. That's not the Texas law. He didn't conclude that as to the principal amounts. He did not include that as to the principal amounts. And you would agree that as to profits, that would be the conclusion. I do not disagree. First of all, we do not have— Interest. Yes. We're talking about interest. And I disagree with characterizing these revenues that our clients received as profits. They are not profits. What Janvey v. Adams said is that this is a contract for a certificate of deposit. My client didn't invest in some profit-making scheme. My client purchased a certificate of deposit, as did all the other clients. And when they purchased their certificate of deposit, they were to receive interest. The question before the court is whether that certificate of deposit agreement is illegal under Texas law. The trial court said it is because it's part of a Ponzi scheme. Well, that's not the law regarding what is illegal or not illegal under Texas law. What makes a contract illegal under Texas law is if the contract requires the parties to perform an illegal act. Here, it's a certificate of deposit. If this was Bank of America or Citibank, we would not be having this conversation about whether their contracts are illegal or not illegal. That's a big if. It is a big if. But the analogy is correct because a certificate of deposit contract is what is at issue in this case. Even if the interest rate negotiated was for an excess amount beyond market rate? Or is that just a hard— No, that's a question of good faith. We do not want to confuse the question of did our clients purchase— Good faith is not disputed here. It's an early reasonable value question. The lack of good faith goes to whether we can properly raise one of the elements of the defense. There's reasonably equivalent value in good faith. The interest goes to good faith, and good faith is not being disputed. The court did not even question whether the interest rates here were too high or too low. The court did not do that. And the fact is they're not. They're in the 6 to 9 percent. The argument has—it's got both legal and economic logic to it, but it does seem in strong tension with our Warfield decision. The Warfield decision is clearly distinguishable, and the trial court recognized that. The Warfield decision was a question of whether a contract for the sale of Ponzi scheme investment contracts was illegal. In a situation where the seller—because they're a fact-specific case—the seller was actually aware of the Ponzi scheme history of these promoters. So this court said where the seller, the person who had the contract and wanted to enforce the employment contract, knew of the existence of the Ponzi scheme seller's history— That's a narrowing of the ruling. I'll go back and read it closely. That's bleeding back into good faith. I didn't read the case to establish that proposition. I read it as a more comprehensive we aren't going to have courts participate in the very fraud the Ponzi scheme occurred by giving back the illegitimate profits. I didn't read it that way. You don't read it. I do not read it that way. The way I read it is if your contract, which is at issue—and you have to look at each and every contract. It's not like all—that's the problem with this rule. It says all contracts are illegal. All contracts. Well, that's what we said in Warfield. That isn't what I read the district court to have said. The district court did not hold that. The district court read Warfield narrowly. My time is up. May I finish? Sure. The district court read Warfield narrowly, as it should have, and said that is not a controlling case. It is on different facts, and it involves an employment contract. It does not involve certificate of deposit agreements, which the district court recognized. And I think the reason we're here on interlocutory appeal is because there is a significant difference of opinion, and there is a significant intellectual difference of what an employment contract means and what a certificate of deposit contract means. Thank you very much. Mr. Sadler. Good morning. I'm here this morning with Mr. Ralph Janvey, the receiver, and my colleague, Ms. Kenyard. I would like to draw the court's attention to two facts and one principle of law, and the principle of law will come back to the comment Judge Higginson made just a moment ago. The two facts are two numbers, 5 and 18. 5 and 18. $5 billion in hard losses suffered by 18,000 victims. That's what we have in this case. We have 18,000 people who didn't get their money out, let alone make a profit. That's the context. But use the terms very precisely. This case is different, that it wasn't making a profit. No, sir, let me address that. Okay. Let me address that. Because one of the things that the cases have told us, including a case out of this court and one of our cases, the Democratic Senatorial Committee's case, is the knowledge, the effects, the conduct of the guy who committed the fraud, Alan Stanford, who's now in prison for 110 years. The receiver is not burdened by that. He is not bound by that. Why? Because it gets back exactly to what you said. Who is the receiver? It was once asked in this very courtroom. The receiver is the arm of the court. What is the court doing? Pursuant to request by the SEC under 15 U.S.C. Section 80, the court took exclusive jurisdiction and control of all of the assets of the Stanford companies. And he empowered Mr. Janvey under his appointment order to go bring those assets back into the fold because that's the only way these 18,000 people will get paid. How could Mr. Janvey do his job if all the promises, all the commitments, all the conduct of Alan Stanford, he just stepped into those shoes and could do nothing about it? But, of course, the receiver didn't step into any of the fraudulent shoes. Precisely. Well, you may say precisely, but nor did the investors. I think the record is beyond dispute that we aren't attributing any of the illegitimacy to their clients. And that's an issue of good faith, which, as you recognize, is not part of this appeal. So then we're down to just a plain language assessment. Did an antecedent debt exist? And I think you say they did. It was a CD. Yes, sir. And let me get to that. Okay. Their entire argument is they concede. I think it's the one thing we all agree on. Their entire argument that they get to keep the profit hinges on this. Okay. They have a contract. It's an antecedent debt. Well, let me, instead of keeping saying it's profit, let's imagine it were a bank loan. And you're not disputing they do get the principal back, correct? That's not in dispute in this appeal. So what's the logical or economic distinction between the principal and the negotiated for not unreasonable interest rate on it? Two things. Okay. These were not loans. They were investments. Why do I say that? Because if you looked at the 12 or so appeals that have come up here and all the briefing that's been put to all the panels that have heard all the appeals in this case, over and over again what's described is these were investors. Every one of these people filled out paperwork to buy their CD, and the title of the paperwork was, and this is in the record, the U.S. Accredited Investor Program. So this idea that they were loans, you will search the record in vain to find any evidence that these people loaned money to Mr. Stanford. They invested. They were promised returns, and that promise was made by Alan Stanford. And their argument hinges on this court enforcing that promise to pay the returns as against this receiver. And as Your Honor pointed out, courts are usually not in the business of enforcing contracts that were made to further the fraud. And the fraud in this case could not have existed without the promise to pay returns on these investments that did not exist. But we're participating in that sense in the same fraud by giving back the principal. What is – No, Your Honor. I'm sorry, because in this appeal and in this summary judgment, all that Judge Godbee ordered was the net profit, the net over their initial investment, be returned. And I can cite you five circuit cases, and we have in our briefing Donnell, Federated Investments, Perkins, that say you give money to a Ponzi scheme. You invest in a Ponzi scheme. If you're lucky enough to get all of your initial investment back, great. If good faith is not an issue, consider yourself lucky. But if you put in more, regardless of what you call it, we're not bound by the terminology that Mr. Stanford, who has 110 years in prison, to think about it. We're not bound by his terminology. Because you will know them much better than I do. How many of them involved written CDs that put down a specific interest rate? How many of those five had that level of contractual debt-specific certainty? So they all involved – and you can check me on this – written agreements. None involved something called a certificate of deposit. But did any of them involve a contractual arrangement where interest on the principal was promised back? What was promised – not in those terms, Your Honor. What was promised was a return. A return. Well, that sounds to me like profit. I mean, if there's no specific amount, then that would be a very different analysis, and the case law is all in your favor. But in this particular case, the interest rates you heard described are a legitimate and low amount. And therefore, if it was negotiated for, how can that not be an antecedent debt that is being extinguished? It's not for two reasons. First of all, if these were legitimate interest rates, we wouldn't have ended up with a $5 billion fraud. The evidence in the record is that Mr. Stanford was paying anywhere from 150 percent to 388 percent more than the market rate. That was the beauty of his fraud. His fraud was not a double-your-money-in-90-days fraud. It was, okay, you could go down the street and buy a CD from a real bank, and they might pay you 2.5 percent in five years, but I'll pay you 4.5. I'll pay you 5. Well, how was he able to do that? How could he pay that? Well, because he was simply taking money from one investor, and he was using it to pay the return. Well, his crime is clear, but what you've got here is a contract. I don't think you're denying there's an antecedent debt. Yes, sir. We are. And I want to be crystal clear about this because, in our view, the Hedged Investments case out of the Tenth Circuit and Donnell addressed the very argument they're making, which is they come to you and say, I had a contract to pay me money. How can you say there's no contract or debt and still say they're entitled to the principal? For this reason, also illustrated by the cases. The cases say the moment they parted with their money initially to Alan Stanford, they became tort creditors. They had a cause of action for fraud for restitution of all that initial investment they made. But you saw, I mean, it's in the briefs, I believe, or the restatement relating to unjust enrichment would say, even as to interest payments, they would be creditors. And that argument is rejected by Donnell and Hedged Investments, and it has to be rejected based on this court's own ruling. In Warfield. In Warfield and in the campaign committee's case, which said the receiver is not bound by the conduct of the man who committed the fraud. What you would be doing by ruling in their favor, you would be doing two things. You would be saying the receiver is bound to carry out a promise made by Alan Stanford. Because it's not just these folks. The receiver cannot avoid the transfer back, the payoff that means that the net value of what the receiver has has not changed. Look at the transaction that happened here. So each one of these people got a transfer back that consisted of two parts. The original money they paid plus excess. The cases absolutely say, as to the original money they put in, they had a restitution claim, which wasn't antecedent debt, which was extinguished by the payment of the original investment. Now what do we do with the excess? And Donnell and Hedged Investments and Shoals, which has been followed by this court, tell you exactly what to do with it. And those cases involve a CD that says you will get 8% back, yes or no? They involve contracts that promised a return. A specific amount? Yes. Okay, yes? Yes. All right. Now did they call it a CD? No. But again, we cannot make the rule of law turn on what the fraudster decides to call his phony investment. That would be a hard rule to police. This is not on what the fraudster did. We're focused on the innocent investor. And no one is saying that they had anything to do with this. If they had any collusion. That's good faith, Your Honor. We're not talking about good faith. So you and I are in agreement. We aren't attributing any. So yes, there are a massive number of victims here. But their clients are just as much victims. So if we look at the public policy to enforce these contracts, that would actually speed the collapse of these Ponzi schemes. You are using the court's power to perpetuate the fraud. And that sounds harsh and it sounds like hyperbole, but I promise you it is not. But that's your answer to the statutory language which tells us just to look at whether or not reasonable value was exchanged. It doesn't say anything about whether the court's involved or losing its integrity. The language that we're looking at is did reasonable value. And I'm saying if you look at the fact that they had a binding contract, not unlike a bank loan, that not only required principle but interest, it's a very hard rule for us to write, I think, that says you get the principle but as to anything extra. That's against public policy. Yes, sir. And that's where you will part company with the cases like Scholes, Donnell, and Hedged Investments is what you said at the beginning. They had an enforceable contract. Because what those cases say is they may have an enforceable promise as against Allen Stanford. Good luck enforcing that. He's in prison for 110 years. But now somebody different is before the court, a receiver. And as against the receiver whose job it is to provide, to collect these assets that never should have left the estate in the first place and provide compensation. What about their threat then? If we announce the rule you're asking us to announce, does that allow the receiver to void contracts with utilities? No, sir. That gave the lights to the Stanford entity. Let me address that because that is the consistent straw man that is brought up by defendants in all of these cases. You're going to sue the janitor, you're going to sue the landscaper, and you're going to sue the light company. Let me address that first by going back to the exchange that happened when not only the principle but the excess was paid. We've already talked about the principle. We'll set that aside. Now we're just focused on the excess. What was the exchange at that point in time with the excess? We should ask reasonably equivalent value, what did the Stanford estate get? What did the creditors who hadn't come into being, what did they get? First of all, they got a depletion of the estate. The payment depleted the estate. What did they get back? Two things came back. Alan Stanford got to continue his fraud because, again, the moment he stops paying the returns, poof, game over. But then we go back to this idea of the antecedent debt, and that's where the cases that we brought to you say, as a matter of policy, we are not going to enforce Alan Stanford's promise to pay the return. And because we're not going to enforce his promise to pay these returns, there is no antecedent debt. There's no REV. No, sir, we're not enforcing that. That's the difference. And you have to go back and look at every one of these cases. We're not enforcing his promise to pay back the principal. It's a restitution rescission remedy for fraud that created the antecedent debt as to the principal, and that is what is being established. I thought restitution law and Texas law also both said you also get in line for interest provided it's not unreasonable. And that argument, if you look at hedged investments, the investor who got way more than what she put in, she made that exact argument. She said, well, wait a minute. My restitution claim is not just for what I put in. I have a restitution claim against the whole thing. I can affirm this contract and accept all the benefits of it, including my return. And the Tenth Circuit said, no, we are not going to enforce that as to the excess. And that is the rule that you should follow. That would be the rule that would be perfectly consistent with Byron versus Warfield, is we're not going to put our stamp of approval on something that was not tangential, but the essence of the fraud. With reference to Warfield, is it your view that controls our decision, or do you agree with opposing counsel that the district court properly distinguished it, and therefore it informs our analysis? I think it's somewhere in between. It's more than informing. It is more than informing. It is posing one of the important questions about reasonably equivalent value. You have to look at what did the estate, what was the status of the estate after the payment was made. Again, as to the principle, we've talked about that. Set that aside. As to the excess, all that happened is Stanford had less money, and no claim was extinguished for the reasons that I have described. And I do not believe that you can enforce this promise as to pay this excess, regardless of what it's called, profit, dividend, interest. That's words that were chosen by people who are now in prison. But also by their clients who are innocent victims like all the rest. Well, again, we are in a court of equity in this receivership, and sometimes difficult choices have to be made. If the summary judgment is affirmed as it should be, every one of these people will be far, far, far better off than all 18,000 because they will have gotten all of their original money back. They're only being asked to surrender the excess. And that is the essence of this rule that has been followed in five different circuits. And we don't make the rule depend on what the, you know, there are so many ways you can concoct a fraud and call different things, call contracts, this and that. So we just look at the money, and we look at the exchange. And that's why they have tried to ride this horse about this was a loan, this was a loan, and gosh, if you invalidate this, you're going to invalidate bank loans and all that. Let's just dispense with all that straw man. Of course, secured debt has specific protective provisions in the fraudulent transfer statute, so paying off arm's length secured debt, that's not going to be touched by the receiver. You will have cases somewhere on the margins, but those cases are not in front of you today. What's in front of you today is a very straightforward, people put money into a Ponzi scheme, they got it all back, and they got more, and the more didn't come from any real investment, the more came from other people. Who? These 18,000. And the law says you have to pay that back. We're not going to enforce a promise to pay you something that was fictitious and didn't exist. And that is the linchpin of their argument. That's why there's no antecedent debt that was extinguished in that exchange. All that happened is Alan Stanford got to run his fraud a little bit longer because he was able, until the money ran out, to pay those returns. What is the total amount of the debt that you seek to recover back? So back to the 5 and 18. The whole that was left, $5 billion in actual principal investment losses. So when I said 5, that is 18,000 people are out $5 billion. And it's a Sisyphean task. Unless money starts raining from the sky, we'll never be able to fill a whole lot. I'm trying to identify the amount of dollars that you seek to recover, which is the excess. The excess. The summary judgment affecting this group of net winners, and there are others who were not part of this appeal but will be bound, is about $33.5 million is what's being sought to recover here. And, again, simply the excess. Nobody is being asked to pay in this appeal any principal. Let me, if I can, with my remaining time, turn to standing because we've been up here so many times. Yes, sir. In your brief, are you acknowledging that the judgment would have to be reformed as to some plaintiffs? Did I read that? And if so, why? So there were, and I think there were only three where there was a difference in the math. One was Mr. Price's client, and I believe we've conceded that there was a difference in the math, and he's right. The amount of the excess is smaller. There was another, the Westmoreland defendants, without going into, I think. Each one is set out in your brief. Each one is set out. All of those are essentially to the side and are going to be taken care of. There's no, we don't have to have a trial over the dispute on the math, in other words. For the vast majority of these people, there is no dispute about what the net was and what the excess was, if that answers your question. Back to standing, because this is something that I thought we resolved four and a half years ago with Judge Prado's opinion in the first Al Gore case, and then that opinion went away and something else came back, and we've been back and forth. And here we are again talking about standing. And what I can say about standing is two roads lead to Rome, and it doesn't matter which pathway you follow, but the standing issue must finally be put to rest. First of all, you have the campaign committee's case, the second version of the campaign committee's case, which said this receiver has standing to sue on behalf of any of the Stanford entities to recover these fraudulent transfers. And DSCC adopted the Shoals rationale of when Alan Stanford was in control, these corporations were just his tools. Now that Alan Stanford's off in jail, these corporations are free. They are free to now recoup the fraudulent transfers he caused them to make, fraudulent transfers against net winners, against political committees, and all those other people. So that resolves indisputably any question about standing. But I do want to remind you that there has always been a second path, another path, a principle of law that was reaffirmed just a year and a half ago in the Jones v. Wells Fargo case, which was another SEC receivership case. And it's been the law since the early 1900s. We started with the Drennan case, Myers v. Moody, and others, all from the Fifth Circuit. It said here's what happens when a receiver is appointed for an insolvent corporation, and he shows up to do his job, much as Mr. Janby showed up to do his job, and discovers assets have been transferred fraudulently in fraud of the creditors. He, the receiver, has always had the power to sue to recover those assets for the benefit of the creditors. That has been the law now for more than 100 years. So whether you take that path, which has been the law for more than 100 years, because we have insolvent corporation, we have receiver, we have fraudulent transfers, he can act for the benefit of the creditors, he can sue to recover those fraudulent transferred assets. Or you take the Shoals path, which is the zombies are gone, they're now real companies, and the receiver can sue. Either way, you have a clear path to standing. And as you rightly point out, you ask the question, well, if the receiver doesn't sue, well, who will? Well, the class action mechanism won't work for a couple of reasons. One is, from day one, there has been a litigation stay preventing the 18,000-plus creditors from running in here and filing their own fractional, individual, fraudulent transfer lawsuits. That stay was challenged at least once. We came up with the Fifth Circuit. It was affirmed. So right there, there's one big problem with your class action. The other, a little more practical problem that this group of appellants represented by Mr. Price would have, is Mr. Price represents people on both sides of the fence. Mr. Price represents people in front of you now who got the excess. He also represents dozens of people with millions of dollars of losses who have filed claims in our process. So that would make a little bit of a tension in trying to put together these class actions. But as this court observed in the bankruptcy context, in the cases in Ray Mortgage America, which was disputed in that case over did the bankruptcy trustee own the fraudulent transfer claim or could individual creditors come in and sue, and this court quite sensibly said, well, look, it is not a solution to an already difficult problem that we invite hundreds, if not thousands, of individual creditors to come in and start filing their lawsuits. That's always been the receiver's job. That's always been the trustee's job. He's the guy that comes in and prosecutes all these claims. So the issue of standing, I think, has long been resolved. I think to go back to where we began with the REV, which is the linchpin, you will have to depart from these other cases to rule that they had an enforceable right, enforceable as against Mr. Janvey, the receiver, in order to rule in their favor. And that will be new law. That will be unprecedented. We ask, therefore, that you affirm the judgment of the district. All right. Thank you, sir. All right. Mr. Pucci, you have two minutes for rebuttal. I just heard that this is an equitable receivership. It's a court of equity. That's true. But equity doesn't provide a basis to go around the law. And this is a statutory claim under Tufta. And Tufta provides that it requires a creditor to have standing. The problem that's embedded in the recitation of cases from the receiver is that Shoals starts under the old statute. It starts before the Uniform Act became enacted in various states. And it carries the same form as the old Texas statute, which provided that persons other than creditors could bring those claims. And here, now, we're under a different statutory framework, different than Shoals. We're under a statute that says you need to be a creditor to bring the claim. And the receiver doesn't address that. The receiver is not a creditor. The receiver represents this now amalgamated gamish of the entities and the three individuals that have all been lumped together as one by the court below. And that's why they don't have standing. Thank you. Thank you. Mr. Pierce. Just a second. The key to it is that Jan V. Adams is decided by the Fifth Circuit after Warfield. And the basis of that decision is that these are notes. Now, Mr. Sackett would have you believe— These are what? Notes? Or notes, yeah. That's what the decision says. The argument that was made in 2009 is the exact one I just heard. And George Carwood hit it head on. And he said you can't disregard the contractual nature because if you disregarded the contract in 2009, he would have gotten the principle. That's what they wanted then. So that's post-Warfield. The other thing is is that this court has recently heard Jan V. V. Alguer. So it's your researched position that in Jan V. Warfield came up and was discussed? There's no question about that, that the case that we had here is the same argument that was made. I'm not asking that, and I know the chronology, but was Warfield brought up in the briefs or the argument in Jan V. I can't tell you, but it had to have been because that was the basis for trying to get the principle back. The other thing is in Jan V. Alguer, which is a recent decision by this court, which was remanded, that involves the suit that the receiver has brought against the employees. This argument of the non-enforceability of the contract is not even raised, which is probably the best evidence you have to show that they don't even believe in it. In other words, they sued to stand for brokers in an issue as to whether or not it's going to be arbitrated. But the receiver has not argued in that case that that contract that has the arbitration provision in it is not enforceable. Now that's Rand and Warfield. That's Rand and Warfield, and they didn't argue that in the recent case that we've had here. And then finally, and I'll close, in my brief I do an extensive discussion about the scheme-based analysis and specific transaction analysis, which is the rules that are followed in every circuit. And they essentially say you don't look at the fraud surrounding the transaction. You look at whether or not the net worth of the entities change. And that's not a rule that I'm creating, just decided by the 7th, 9th, and 11th Circuit. And then in Texas, the law is clear that you have a right to prefer one creditor over another one. And that's the Quinn case dating back to 1956. And this Alexander B. Holding is a Northern District of Texas case. Finish your sentence when the red light goes on. You keep adding paragraphs. We've got your argument. Thank you, sir. Thank you. All right, this concludes-